Good morning, Your Honors, and may it please the Court, Matt Malone for Plaintiff and Appellant Tucker Durnford. I'd like to reserve five minutes for rebuttal, if I may. Your Honors, the Food, Drug, and Cosmetics Act, as amended by the Nutrition, Labeling, and Education Act, does not preempt Mr. Durnford's claim here that by advertising the Arnold Schwarzenegger Iron Mass Protein product to have twice the amount of protein that it actually has, MusclePharm misleads consumers in violation of California law. His lawsuit does not purport to impose a requirement different from federal regulations, even assuming Congress intended to preempt such a claim in the first instance, nor is it rational or reasonable to require him to file 12-sample testing protocol to satisfy that protocol in order to survive a motion to dismiss. Would he eventually need to satisfy that testing protocol to succeed on his claim? I do not believe so, Your Honor. Why is that? The reason is that by the time we get to discovery on the claim, we will learn what is actually in the product from the production facilities of MusclePharm. So it would not be a situation where we would have to do an FDA regulatory style investigation. We would know how the product was produced. But is that because you just jumped to a different form of your claim? So I understand that part of your theory is that this protein isn't really coming from beef and lactoferrin. It must be something else. That's different than what you started with, though, which is that they're listing at twice as many grams as they should be listing. That's a different thing. One thing is, is it a different type of protein? And then there's a question of how much protein. So when I asked you the question about what kind of testing you would need, you jumped from quantity to type, as I understood it. But maybe not. Can you correct me if I'm wrong? Well, I would guess the two are related, right? Because if we're talking about what is actually digestible protein, so if the composition is these nitrogen-enhancing filler products, then that would affect the total protein content overall. And so you think you can have a claim, forgetting whether it's beef and lactoferrin, just how many grams of protein are in this product? You think you can win on a claim about how many grams of protein are in this product without using the FDA's testing method? Yes, Your Honor. Even though you started with even assuming, I think you said even assuming it's not pre... What was your... Are you challenging that testing method as valid in order to say that you don't ever have to show it? I am challenging it as valid for preemption analysis. And the reason that we challenge it as valid for preemption analysis is that no consumer could ever satisfy it right now, at least... But that has to do with the pleading stage. So I asked you about whether to succeed on the claim ultimately. I think ultimately to succeed on the claim, we have to show that the protein in the muscle farm product is not what's represented. Now, the fact that the FDA independently does this test as a regulatory compliance mechanism does not determine whether or not the protein representation... But I thought the thrust of your argument about the 12-step process was you, as a consumer, have no ability to be able to use that process in advance of filing a complaint, and because there are 12 separate units that have to be extracted. And your suggestion was we need to go through discovery, which would permit us the opportunity to go through this particular testing. I thought that was your main thrust, at least in your pleadings. Now you're suggesting that even if you got past the motion to dismiss, you wouldn't even necessarily try to adopt these particular protocols? Correct, Your Honor. There's sort of two questions implicit in that. And the first is, yes, we say that if the requirement is to do the 12-sample testing, we would never be able to do it without some form of discovery. That is, we would never be able to do it unless we knew production... Why wouldn't there be discovery be into whether or not the company did the 12-protocol test? Because the company is not required to do the 12-part test. The 12-part test is not a manufacturing requirement. It is only used by the FDA in those occasions where the FDA seeks to do a compliance analysis. I'm sorry? Okay, go ahead. Yeah. So it's not required as a... It's not some sort of pre-approval test, if that analysis makes sense. But if your argument is that the company is not complied with FDA regulations, you would think you would use the protocols that they've set out to establish that position. We could if we... And I'm not foreclosing our doing that test. What makes it difficult, however, is what the test actually requires. But that's true at the pleading stage. So let's give you that you might not have to do it at the pleading stage. I'm very confused why you don't think you ever have to do it. Can you explain that? Because it is not a test that a manufacturer has to do to produce the product. So it's a regulatory analysis, if you will, a regulatory check. But it is not in and of itself a... It is the way that you show the product is in compliance with the regulations. And your position, of course, is the product is not in compliance with the regulations. So it seems to me self-evident that you'd have to go through this 12-step protocol. Well, then let's concede that for sake of... My understanding is that you're not really... I thought that you were focusing on number three... No, number two, 40 grams of a potent blend of hydrolyzed beef protein and lactoferrin protein and saying that, in fact, there isn't 40 grams of those two things together. There's actually only 20 grams of those two things together, which has nothing to do particularly with... It doesn't have to... I mean, it implicates the protein spiking, but it's not directly the protein spiking. And therefore, you're kind of not testing. Testing whether or not they complied with regard to the protein spiking wouldn't prove anything anyway. Well, that's correct. And that's sort of the second part, the second prong of that analysis, is that when MusclePharm chooses to make a separate representation outside of the nutrition box that is regulated by the FDA, and that representation comes... There's actually a misrepresentation on a different part of the label, and then there's another misrepresentation in the nutrition box that they added. Then we've come completely outside of what we're talking about in terms of the 12-sample testing, because we have a completely different misrepresentation that is not required by the FDA. But also, my understanding is that you're not challenging, although I don't know that you couldn't, the question whether the protein spiking, in fact, complies with the FDA rule. We're not challenging... The notion that when the FDA says you can use 6.5 times nitrogen, they're not talking... They're allowing you to add nitrogen that doesn't represent protein. I mean, it seems to me that that may not be true. That may be a misreading of the FDA's rule. But you're not challenging that. Well, in fact, we are challenging that. We're challenging it right in the introduction, where we have statements from the FDA that they never intended for a manufacturer to be able to use the 6.25% nitrogen measurement as a basis to misrepresent the total digestible protein content of the product. So for that purposes, I guess you would need to be able to demonstrate what the actual protein is versus the nitrogen. So then this problem of what standard you use to do it would arise. Correct. Although, again, it would at worst arise at a later date than what we have here. So how do you think you'll prove this claim? I do think that what's going to happen is once we establish that the claim is not preempted, we're going to be able to obtain discovery about how the product is manufactured. So, for example, the product formula and whether or not we, in fact, have what our single test verified, which is that there is a half of the actual product, protein, excuse me, in the product is real protein. And if that is the exact form. How will you prove that, though? What will you do? You're going to get samples? What will you do to figure this out? So we would have to get, if we're talking about complying with the 12-sample testing. Well, no, I just want to know what you think you're going to do to prove this claim. You're going to get discovery, and what are you going to ask for, and how are you going to prove that this is false? We are going to get discovery. I would document discovery on how the product is produced, what the formula is. We would get discovery, ostensibly testimony from a person's most knowledgeable relative to how the product was developed. We could get tests, and I would assume all that would be correct. But ultimately, you're going to have to translate that into grams of protein, and you're going to do that some way other than the way the FDA says to do it? I don't understand quite how you're going to get to show that it's false. I don't know that we would have to do it in some way other than the FDA. I think the problem with imposing the FDA requirement is that we have to know specifics about how the product was shipped so that we can get 12 samples from different shipping cases. We also have to know, under the definition of lot, under 101.9 G1, we have to know... So now you're saying you are going to go through these steps? What you're ultimately going to do is get these 12 samples and do the FDA test to figure it out? I'm saying I won't foreclose that here. We could do that if we can get samples that somehow satisfy the specifics of that requirement. But I don't know that that's going to be possible, because it certainly wouldn't be possible without some information from MusclePharm. Perhaps they've done this testing independently. We sit here right now not knowing any of this. So when the district court judge used the approach of protein content, basically suggesting that 6.25 is the standard laid out by the FDA, that in fact nitrogen is very much a part of that test, suggesting that your claims would impeach or would discredit that particular approach, and therefore it's preempted. But then in the protein composition, said that there was no preemption, and yet you in your briefs have basically suggested that the judge should never have made that distinction between protein content and composition. Why is that? Well because in essence they're the same claim from a consumer perspective. They're the claim that what is represented on the label is not an accurate representation of the actual protein in the product. Whether that is because of the filler and the measurement, or whether we call that a composition claim relative to the measurement using nitrogen, or whether we call it a protein content claim relative to the representation separately on the label that this 40 grams only contains two proteins. But you can succeed as to the first only if the FDA does not sanction the protein spiking. If the, if we separate the claims out and say that the protein composition, which is the 6.25 times. I understand. Right. Okay. So that measurement, would we be able to continue on the claim if that were only, if that were the only claim we were making? I think that we could because we still have separate misrepresentations. The focus of the What's the separate misrepresentation? There's 40 grams of two proteins. But now you jump to a different claim, right? That's, you added the of two proteins, which gets to the other form of your claim, which is what the type of protein it is. Or where it's from. Well, you can't measure, I mean, you measure the 40 grams of protein in some way. It's, you're stating But it's also a 40, I mean, they're saying 40 grams of these two things. Correct. So therefore, it's just those two things. And they're, and they're, if, even if protein spiking is okay, there are, they're essentially representing that they didn't do it because they have 40 grams of these two things. Right. 40 grams of two proteins. All right. But that's, so I understand that part. But, but you're also, as I understand it, challenging the, the official label. Correct. And on that, you can only succeed if they're not complying with the FDA. Well, not the way they've designed the label. Because remember, at the end, they've also added something to the label itself. They've added this muscle plasma protein matrix. No, but I understand that to be not the official label. The official label is above the, the line. Right. Okay. So if we're, if we're eliminating the muscle plasma protein matrix, we have then the, the, the state, there's the simple protein statement. And at that point, the reason that that does not itself become preemptive is because I go back again to the fact that, in particular to this case, at this stage, a consumer is not going to be able to satisfy that at the pleading stage. We're not going to... No, but I, but, but I'm a little, my, I understand why you're not walking away from it, but it has to be on the ground that the FDA does not allow this protein spiking. Otherwise, if, if the FDA says it's fine, if, if, if you represent there are 40 grams of protein, even if 20 of it is, is, is added nitrogen, then you can't win. As... As to the official label. I don't think that's true, because I think that the intent of those regulations was not to permit the kind of representation... So you're, so to that degree, you are challenging the notion that they allow...  Shouldn't the FDA ask, if, if, that's really the heart of this case, which I didn't think it was, shouldn't we be asking the FDA for a position in the case? I don't think you need to ask the FDA for a position in, in a case where you have independent misrepresentations outside the official label. Oh, I understand that, but that's, that's different. But if you really want to go forward on that, on, on the official label and the protein spiking, then that piece of it, it seems to me, we have, we don't, is there any case law at all on whether the FDA, this is in fact what the, what the FDA regulation means? I am, I'm out of time here, but, but, but there is the only case law of, of, of analyzing what the, the FDA means in regards to these regulations that I'm aware of are the many district court cases that we've, that we've cited in the briefs. So there's a debate about what the FDA means, and a lot of those are coming in the, in the, in the motion to dismiss context. I, I thought it was generally understood that in fact, you know, even though this seems a little weird, that the FDA regulations as written allows us. As written, I'm sorry, Your Honor. That the FDA regulations as written allows us, is that not? The FDA regulations as written allow for the measurement of the protein for FDA compliance to be, to be based upon the 6.25%. They do not allow a, a, a, the separate misrepresentations in, in, in this case. Can I ask one question about the separate misrepresentation? So your test that you did, you did some kind of protein test. Is it, are we supposed to read your complaint to suggest that if the protein had all been from beef and lactoferrin, the test results would have had to be higher in your test? Correct. It would be, it would be, it would show up as, I believe it's digestible protein in that, in that test, it would show up higher. So did you allege that beef and lactoferrin is all digestible protein? And, and did you have the logical connection that I just asked you about? I believe so. I believe that's paragraph 30 of the first amended complaint, I think, where we allege that, that the testing we did showed that, that this product only had a certain amount of digestible protein relative to, relative to the non-digestible filler product. And but I'm asking you whether you have ever said that beef and lactoferrin are all digestible and thus any protein gram from beef would show up as a full gram on the test that you conducted. I don't think we were that specific in the first amended complaint. No, Your Honor. Okay. Thank you very much, sir. Good morning, Your Honors. May it please the court. My name is Michael Suffern. I'm with the law firm of Omer and Byrne in Cincinnati, Ohio, and I represent Muscle Farm Corporation. I must admit that hearing counsel's argument presented a case that I didn't really see in, in the first amended complaint or in the briefs in this case. And indeed, it presents a case that goes well beyond the holding of any court that has addressed the issue of these so-called protein spiking cases, a mischaracterization from- And why is it a mischaracterization? Protein spiking? Because protein spiking assumes that the non-nitrogen containing ingredients which a manufacturer is specifically permitted to use in measuring protein, first of all, it assumes they're non-digestible. It assumes they have no value. It assumes contrary to- It assumes that they're not protein. I'm sorry? I thought it just assumes that they're not protein. Well, Your Honor, I think that this brings us back to the statute as opposed to the regulations. And I think that this is a very important point that maybe we even missed a little bit in the briefing. 21 U.S.C. Section 101.9C7 clearly permits Muscle Farm to declare the including the 6.25 times the nitrogen contained. That's a regulation, not the statute. Clearly. Wait a minute. But the statute- It's a regulation, not the statute. Right. The statute requires manufacturers to state the total amount of protein. If a manufacturer has protein in its product, and if a manufacturer calculates total protein in a way that 101.9C7 permits it to, a manufacturer must, under 21 U.S.C. Section 343Q1D, state the total amount of protein. And they have to call it protein, Your Honors. Under 21 U.S.C. Section 101- But the authority to use the nitrogen essentially proxy is not mandatory. It is not mandatory. But I don't understand how you translate that into a mandatory requirement, that if you have it in the product, you have to call it protein. You don't have to even count it. No. But what I'm saying, Your Honor, is that if a manufacturer did use that method, that it's specifically permitted to use, and if the test result came back and showed that using the method that you did, that's specifically permitted by regulations for you to use, you get a number, that you have to put that number on the label. Otherwise, we'd be in here on a false labeling claim where we're stating, where we're differentiating between the sources of protein on the label, and the teaching of the case law is that FDA does not permit you to, excuse me, does not require manufacturers to differentiate between the sources of protein. But, as I said before, I was not aware that they were actually challenging here the notion that the FDA regulations permit adding nitrogen that is not connected to protein and then counting it. But they say they are. And is there any FDA authority for, it is one way, I guess, to read the regulation in an odd way. Has the FDA, I gather the FDA has suggested some discomfort with it, but has never actually rewritten the regulation. That is correct, Your Honor. Actually, I'm not aware that they have expressed discomfort with it. It is what it is. It's a regulation that permits manufacturers to include the nitrogen content in declaring the amount of protein. So, you don't have to say, though, that the amount of protein comes from beef and lactoferrin? We do not have to differentiate on our label the sources of the protein, nor do I think we have done in this case, Your Honor. You don't think the label tells us that the protein comes from beef and lactoferrin? We think that the differentiations on the label are classic structure function claims. What does that mean? They address the role that the different dietary ingredients play in the diet. And the reason that the label differentiates... But it says 40 grams of these two products. Forty grams... Of two forms of protein. Of a potent blend of beef and lactoferrin protein under the heading muscle volumizer. No, but what about the front of the package? That's where I believe in the First Amendment complaint that we're alleged of having deceived them by saying that. It's both in the panel, in the Supplement Facts panel, and elsewhere on the label. And what I'm saying is that the only differentiation regarding the sources of protein were intended to serve as structure function claims. These elements... 40 grams of a potent blend of hydrolyzed beef protein and lactoferrin protein as meaning there are 40 grams of protein from beef and lactoferrin. You might disagree, but if we think that, then tell me why it's preempted for them to have a claim that says, we've done a test that shows there's no way there are 40 grams from beef and lactoferrin. And so we think this is false and we want to proceed. What is wrong with that? Well, as every court that has addressed this issue has held, whether they've held it as a pleading requirement or as a proof requirement, when an FDA regulation requires that the question of compliance must be determined using the method specified in the statute... But I'm not — I would be — let's say you're going to win on whether the FDA label is accurate because you tested it properly. Let's give you that. But that doesn't capture the beef and lactoferrin claim. So I want to know, can you just say beef and lactoferrin if there's no beef and lactoferrin in here? No. Okay. So how — so can't they bring some claim that says, we think we've done a test that shows this isn't really beef and lactoferrin? Well, they might be able to bring a claim like that if they plausibly allege that the And so they say they've done a test. They say, we've done this protein test. It shows that there's no way that all this protein they're claiming is really from beef and lactoferrin. So we think this label is false. What's — is your problem that the test isn't good enough? And if not, why can't that be fixed with amendment or a later discovery? I'm not sure what you're saying the problem is. One is that the entire theory of the case, including the theory of the testing, is that we're going to prove this by — and therefore seek to impose liability on MusclePharm by — for doing something that you are explicitly permitted to do by the regulations. What's that? But the other thing is that the — I'm sorry, would you — Why is it that you're explicitly permitted to do? To calculate protein based on 6.25 times the nitrogen content. That's from beef and lactoferrin. So what is explicit in the regulation that allows you to make that claim? Well, as I mentioned earlier, if we do declare protein, we're required to declare total protein under section 343Q1D. But in addition, if I may answer your — Okay, so you could have said 40 grams and not said this beef and lactoferrin thing, but you did say the beef and lactoferrin thing. So why can't they challenge that as false? Well, if I could get back to your original question, which would — and give you an idea of the second part of it, why the testing is noncompliant. This test, if you look at the test in the first amended complaint, it doesn't even identify what the product is. It doesn't identify what methods were used. But don't we — I mean, so, okay, so we could — I mean, maybe the answer should have been that there's not enough specificity about the top of the printout. I mean, I think you might be able to read it charitably about why would it be in here if it wasn't a test of this product. But we could say they get to amend. So why couldn't they get to amend to try to fix that? They were given leave to amend by the district court in this case. I know, but I mean, there's a point at which the Iqbal specificity thing becomes a little silly, you know, in the sense that they say they tested this product and it didn't meet the standards. Why isn't that good enough? Why do you have to start honing in on more details and simply making their pleading, just pleading more onerous? I mean, there's — throughout this calendar, you will see a great reluctance to anybody ever getting to summary judgment. You can get this case over with pretty fast if it isn't true. You can just come forward and show it isn't true. So what's the problem here? Because under 21 U.S.C. section 101.9G2, the only way, the only way that the plaintiff can prove noncompliance is by the testing methodology that's specified in the regulations. But that's not really what it says. It says that, excuse me, they're not trying to prove what the testing protocol requires that the company prove if challenged. They're not — they're trying to prove something different. They're trying to prove that these two particular products are not making up the protein. That wouldn't even be a question under the protocols, because that's not what they care about. So it's not — it's apples and oranges in terms of what they're trying to prove. And that's why we think it gets to the heart of the preemption analysis, Your Honor, when — and that's why every court to have considered the issue has at least held that in order — What issue? The issue of whether — Has this exact issue, i.e., if you say we have protein made up of A protein and B protein and we have 40 grams of it, that that is — can't be tested however one would ordinarily test that and is not covered by the FDA rules, because the FDA doesn't require that you say where the protein's coming from. The FDA does not require that we say where the protein's coming from, but it does require us if we declare protein on the label to declare it in a way that's consistent with the regulations. Right, but you didn't only declare that. You declared something more than that. It doesn't preclude you from saying something more specific than your — suppose you had put a label on that said, 40 grams of protein, and this is real protein, not just tested by nitrogen. Then what? Then could you defend it on the ground that that's okay, even though if it was based on a nitrogen proxy, it's okay, even though you said it wasn't? Well, Your Honor, if they just allege that, and I, you know, don't want to — I'm asking you about — you didn't answer my question. Suppose you had a label that said 40 grams of real protein, not just nitrogen-tested protein. That would be a threadbare allegation of a violation of the consumer protection statutes with nothing more. Here, the only — Well, but it would be something more if they do testing. I mean, what if they do the 12 sample tests before they file their pleading, and they say, we've done this test, and we can show it? That — then we would have an entirely different case, Your Honor, and we would not be arguing federal preemption. But here, as — So can I ask you a different question? So if they — if we think the state's a claim about whether there really is — it's all beef and lactoferrin, and they get discovery, and they can get your formula, and there's no beef in there at all, do you think that claim is preempted? I don't think that claim is preempted, but I don't think that they are permitted at this point to go on that fishing expedition. And this — the jur — this case was dismissed without prejudice, Your Honors. And this Court's jurispru — four times in their brief, they asked for leave to further amend. If one were actually to summarize exactly what you've just said, you really do agree with approach — the approach that the district court took, splitting protein content, which is — suggests it's preempted because of the 6.25 required use, and then using nitrogen as a result, that's preempted because it puts at risk the very test that's being used. But then the composition argument suggesting that there, in fact, is not preemption because there is no definitive requirement by the FDA that you actually list where the source is of the particular product. So as a result, at least as to that fundamental approach that was made by the district court, you agree. Basically, what you want to say is that the protocol is required, and that, of course, was not done here. But that becomes an issue of pleading versus, you know, application of the protocol sometime later on. But at least as to the way the district court approached this, I think you agree. Do you? Well, I don't — just because conceptually there's no fair way to read the First Amendment complaint in this case without reading it as an indictment of 101.9c7. And — and the very test upon which they purport to a lie, they appear to admit, although we can't tell because there's — all there is is a table of results, but it appears, accepting as true their theory, it also appears to comply with 101.9c7. So I don't conceptually agree with what the district court did, but I do think there is a path to plead a misrepresentation claim. They just haven't come close to doing it here. So how should they have pled the idea that this isn't really beef and lactoferrin? For starters, they could have at least taken the opportunity the district court afforded them to file an amended complaint in which they allege that compliant testing would show noncompliance. But the compliant testing is not to test this. I — it's not to test the composition question. I understand that the — he said clearly today that he is also going at the other issue. But as to this part, i.e., does it have beef and whatever else, that isn't what the district court is going to do. It's not to test whether there is compliance with the FDA requirements. He is not claiming, as to that, noncompliance with the FDA regulations. He's claiming something else. So it's just, as I said before, apples and oranges. But it's not in the sense that if the California state law claims were permitted to proceed in the face of a Federal statute that said noncompliance can only be measured — But it's a different noncompliance. They're not saying — they are partly saying noncompliance with the regulations. But they're also saying, forget the regulations. This says 40 grams of A and B, and there isn't 40 grams of A and B, and the regulations don't talk to that. Therefore, we're not trying to test compliance with the regulation. They would still have to prove that claim — Right. But isn't the total — I think another way of phrasing the same question, I think, is following the FDA testing, it is never going to tell you whether it's beef or not, right? Following the — that's correct. So how does he allege this is not beef? Because you've admitted that wouldn't be preempted. So what is he supposed to do? You said before the answer is he has to say it's going to — he has to follow the FDA test. But now you've said, no, that's never going to tell us whether it's beef. So what is he supposed to do to tell whether it's beef? Oh, I'm sorry. I was confused. 101.9 G2, you certainly could determine — you could test 12 subsamples, one from each of a different — a shipping container that is representative of a lot for the composition of the protein as well. And if you were going to prove a mislabeling claim under California law, based on that So does — so I think what you're saying is he has to do 12 samples, but isn't the FDA's test just going to give us a number? It's not going to tell us whether it's beef? No, not — no, Your Honor. There are many testing — 101.9 G2 only addresses the number of samples and gives broad outlines about testing methodologies. Okay. But G — let's take G. All right. What is the heading of G? Compliance with this section shall be determined as follows, right? Yes, Your Honor. He's not claiming noncompliance with this section, so he doesn't — why does he have to do it this way? Because if he — if he's allowed to hold Muscle Farm liable under California state law for something less than what Federal law requires to prove noncompliance — No, something different. Something different. Well — Which is what exactly — excuse me. What exactly is in the product? Is there actually 40 grams of beef protein and some other kind of protein? And again, 21 U.S.C. section 343.3 prohibits states from establishing any requirement for nutrition labeling of food that is not identical to the Federal law. Does the Federal law have an approved method for testing whether something is beef? No, Your Honor. Not that I'm aware of. How about whether it has a way of testing whether it's lactoferrin? Not that I'm aware of, Your Honor. Okay. So we don't have a Federal test for either of the claims that is — putting aside the grams, this says our protein comes from beef and lactoferrin. If we read it that way, then he can't do a Federal test because there is no Federal test. So don't we have to have some other way? Oh, no. Oh, no. He can. He would still have — whatever test he chose to do in an attempt to prove that would still have to comply with the requirement of G — 101.9 G2. All right. Well, you keep saying that. Which requires 12 subsamples. I just had one question. Yes, Your Honor. You can understand why, when the plaintiffs were afforded the opportunity to amend, they didn't do so because the district court basically said the 12-step protocol was required. And frankly, they couldn't do the 12-step protocol. So if they actually were to amend, they couldn't amend it in a way which would have been acceptable to the district court because they couldn't do the 12-step protocol. So as a result, they appealed. I think to actually criticize them for not trying to amend to resolve some of the issues that you're talking about is not accurate because they couldn't amend it to satisfy the district court, frankly. Your Honor, two things on that. One is they certainly could have alleged that testing done pursuant to 101.9 G2 would have demonstrated that it was not what the label claimed it. And what would you have done on Iqbal then? You would have said, how could they possibly know that? They haven't done it. But I'm responding to His Honor's question about what the district court did, too. And the other thing, very importantly, and I know I'm out of time, but let's not forget reliance. They gave up, they abandoned the opportunity to allege, to plead reliance, which in and of itself is a reason to affirm the district court. This Court's jurisprudence that permits plaintiffs to appeal, motions to dismiss when leave to amend was granted, is founded on the notion that if you do it, you must stand on the complaint that you have. Okay. Thank you, Your Honor. Thank you very much for your useful argument. We have a little time in Ravella, either a minute or, I don't know, maybe a minute. A minute. And we're going to take a break right after this. Thank you, Your Honors. If I may say, first of all, the reliance, the reliance will be the first thing I address very quickly. The district court addressed reliance only in regards to a separate claim, what they called the, what the district court called the nitrogen spiking claim. Otherwise, there was sufficient reliance to get protein composition and protein content forward. The second point I will make is one question that has never been answered in any of the cases where the plaintiff is ever going to satisfy 101.9G2 at the motion to dismiss stage. They don't have access to production facilities. They don't have access to shipping containers. There is no way to do it. Do you need to allege, though, that whatever test you did do is equivalent enough to what the Federal test is, that once you do get 12 samples, the result will be the same? No, Your Honor, because that would be, I mean, at best, that would be a speculative statement in and of itself. But the Federal test, I mean, as written in the reg, has a subset of components as well. It's just not in the reg. It's a reference to something else, right? Yes. Did you do that? The reference to, I guess I'm confused as to which reference. The way in which you do the testing, in other words. Let me just. Oh, it's a reference to a lot. The 101.9. I know. That's part of it. But it also says that it is a reference to a lot. But I understood there to also be a substantive component, because it says the sample shall be analyzed by appropriate methods as given in the official methods of analysis of the AOC International, or if no AOC method is available or appropriate, by other reliable and appropriate analytical procedures. So substantively, there's a requirement as well. There is a substantive requirement in that regard with reference to those procedures. But again, we come back to the problem of. Oh, I'm asking whether your test complied with the substantive procedures, not the numbers and the lots and all that. I don't know that I would. I believe it did, but I can't answer that for certain, because I don't know those procedures. Why don't you have to allege that it does? Because the plausibility requirement requires us to allege that there is less protein in this product than advertised in that 40 grams of two proteins. We did a test. It showed half. But I mean, if your test was, let's look if it's blue or red, that's not going to cut it, right? So you have to say something about how your test is getting at least close to the test you'd ultimately have to do to win, don't you? I don't believe so. I think we have to show a test that answers the question of does this consumer have a reasonable belief that there's and a plausible claim that there is less protein than represented. And there's no way to, you know, conducting this one test, if we're going to talk about the merits of the test, that again takes us beyond motion to dismiss in any event. We question the methodology. We question whether it goes, whether it satisfies the standard. I mean, we have alleged a plausible case for a misrepresentation here. Okay. Thank you very much. Thanks to both of you. The case of Durnford versus Muscle Farm Corp is submitted and we'll take a break.
judges: Berzon, Friedland, Sessions